**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| Trisha Whitmire and Emily Yanes de Flores, individually, and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>MONAT GLOBAL CORP.<br><br>        Defendant. | Civil Action No. 1:18-CV-20636-DPG |

## PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER, A TEMPORARY RESTRAINING ORDER, AND A PRELIMINARY INJUNCTION

Defendant, Monat Global Corp. ("Monat"), is engaging in a campaign of intimidation against anyone who dares questions the efficacy of its products; products with obvious flaws resulting in well-documented injuries to Plaintiffs and the proposed Class.  Accordingly, pursuant to Federal Rules of Civil Procedure 65 and 23, Plaintiffs Trisha Whitmire and Emily Yanes de Flores, individually, and on behalf of all others similarly situated, hereby respectfully move, *ex parte*, for an order of this Court to protect their interests and the putative class.

## I.        INTRODUCTION

Monat is a multi-level marketing (or pyramid selling) purveyor of hair care products.  The use of Monat's products, however, has resulted in significant scalp irritation and hair loss for many consumers.  (DE 1). Plaintiffs recently became aware that Monat and its counsel have been systematically threatening, harassing, and intimidating potential class members in multiple ways. Whenever Monat becomes aware of any public criticism of its products, including the type of criticism that forms the basis of this case (i.e. generally that a significant number of customers appear to have adverse reactions to Defendant's products including scalp irritation, open sores, hair breakage and hair loss), Defendant quickly moves to silence it.  Monat does so by routinely sending cease and desist letters that threaten lawsuits for defamation and other business torts, that seek to obtain false declarations or statements recanting negative (but true) experiences with Monat products, that seek to take control of public forums (including Facebook groups and online bulletin boards) where Monat products are discussed, and that seek *de facto* gag orders of any negative discussion of Monat products.  Defendant also routinely sends letters to potential class members in order to obtain releases of the legal claims associated with these lawsuits and declarations containing false statements. Many of these releases were procured through misrepresentations, material omission, or outright fraud. Given the improper communications between Defendant, its

counsel, and the putative class, Plaintiffs now seek a protective order limiting Defendant's communications with the putative class, an order for corrective class notice, and an order invalidating any releases obtained by Defendants subsequent to the filing of this action.  Plaintiffs further seek a temporary restraining order and a preliminary injunction, enjoining Defendant from engaging in its improper communications.

Defendant's threatening, harassing, and intimidating communications with members of the potential class have a chilling effect on this litigation, dissuading consumers from participating in this case or speaking the truth openly, undermining the policies of Rule 23.  Defendant's practices also are also actively interfering with Plaintiffs' investigation of potential claims, as the public forums that Defendant seeks to silence or control (like the Facebook groups where all Monat products are discussed) are critical to the thorough investigation of the claims.  For instance, there are nearly 40 products made by Monat and the online groups are a collection of witnesses using all of the products and enable counsel to locate witnesses and make distinctions about which products are most suspect. The online forums that Monat seeks to silence or control also serve as a *de facto* notice mechanism to potential plaintiffs and putative class members.  Monat is actively attempting to minimize participation in this lawsuit and to limit its financial exposure to the claims against it through sharp and unethical tactics.

Defendant's conduct in threatening defamation suits may also violate either the letter of, or certainly the spirit of Florida's Strategic Lawsuits Against Public Participation, or Anti-SLAPP statute – Fla. Code Section 768.295.  Defendant's threatened defamation lawsuits against potential class members who are exercising their First Amendment rights to publicly discuss Monat products in an online public forum are classic examples of the type of meritless lawsuits used to threaten,

harass, or silence critics by forcing them to face the prospect of defending against such meritless suits (with the attendant expense) that the anti-SLAPP statute protects against.

## II. STATEMENT OF FACTS

Defendant is a multi-level marketing business that sells haircare products.  A major thrust of Defendant's initial business model was to sign up professional stylists as "Market Partners," to have those stylists buy and use the products, to convince clients to buy the products, and to sign up other stylists as Market Partners in a pyramid fashion. (Ex. 1, Nittinger Affidavit) As part of this effort to enlist stylists starting in 2015, Defendant had its existing Marketing Partners join internet forums on Facebook for Salon Professionals.  Many stylists were resistant to selling the product because it was not a professional-grade product, and Monat's magic cure-all marketing claims seemed exaggerated and unsubstantiated. (Id.)  However, the stylists who raised these concerns or offered any criticism of the product based either on their personal experiences or expertise were quickly confronted by Defendant with threats of suit for defamation and other business torts. (Id.) This was originally communicated by Market Partners themselves before it escalated to communications directly from the Defendant or its legal counsel.  (Id.) While these threats worked on many of the online critics, others refused to be bullied and continued their online sharing of information and observations. (Id.)

### A.  CLASS MEMBERS' PROTECTED ACTIVITIES

Vickie Harrington, a potential class member, was enlisted as a Marketing Partner for Defendant when she purchased the $900 kit and began using the products herself. (Ex. 2, Buzzfeed article). Within a month or so, she started losing her hair after using Defendant's products. (Id.) She asked for a full refund and Defendant refused. (Id.) In November 2017, Ms. Harrington started a Facebook group titled "MONAT – My Modern Nightmare," and created a YouTube video

attempting to reach other potential victims suffering symptoms that she believed were caused by Monat products. (Id.) Her initial intention was to find out if there were at least 40 other similarly situated people so as to confirm that these symptoms were not an isolated incident and hopefully gain representation by counsel to file a class action lawsuit. (Id.) With nearly 40 products offered by Monat, the Facebook group served as a way for potential class members to compare their experiences with the multitude of products and attempt to discern whether there were specific products that correlated with adverse effects. See https://monatglobal.com/all-our-products/

The Facebook group grew exponentially and eventually there were over 20,000 members. (Ex. 1, Nittinger Affidavit) While the majority of the posts in the group were made by users of Monat products sharing their experiences and opinions, the group also contained posts by group participants that addressed any manner of subjects related to Monat. (Id.) Among the tens of thousands of posts, members shared that they were being threatened by Monat's Market Partners. (Ex. 3, February 8, 2018 post by Christman). For example, in this post a Monat consumer stated:

> My MP just told me I could be sued simply for being in this group (crying emoticon) and I don't know who to believe anymore. Is that even possible!? I've been here for like 2 weeks. And haven't hardly said anything. She also said all of you are hair stylists making up lies about Monat…. but I saw pictures of a 6 year old losing her hair yesterday and it broke my heart (crying emoticon) she is not a hair stylist…. And most of you aren't either.

There were also some reporters who joined the group requesting to do interviews with people in the group about their experience with Defendant's products and many of the group members were connecting with the reporters and other members of the group sharing their experiences.

### B.  MONAT ATTEMPTS TO CONTROL SHARING OF INFORMATION

Vickie Harrington, the group's creator, was sued by Defendant Monat for more than $225,000 in damages. (Ex. 4, Complaint Monat Global v. Harrington). One Tulsa Oklahoma news story featuring victims Leah and Amber Alabaster was not aired by the station because counsel for

Defendant threatened the television station with defamation claims.   (Ex. 1, Nittinger Affidavit) On February 7, 2018, an article about Monat filing a lawsuit against Ms. Harrington was posted on the popular news/media website, Buzzfeed. (Ex. 2, Buzzfeed article).

Soon thereafter, every administrator and moderator of the Facebook Group was served with Cease and Desist letters in the first week of February. (Ex. 5, Compilation of cease and desist letters).   For example, Sandra Merschrod, Vicki Nittinger, and Breanna Haspert each received Cease and Desist letters containing the same threats. (Ex. 5) These letters required that:

1) all posts mentioning Monat from personal Facebook pages be deleted;
2) an affirmative statement be posted that the Administrator or Moderator was lying about the products and the company;
3) a statement be posted that, because there were so many lies posted in the Facebook Group, the Administrators had decided to close the group;
4) every member be deleted from the group;
5) every post be deleted from the group; and
6) the group itself be deleted.

Because Vickie Harrington was the group administrator and the group owner and creator, she was the only one able to facilitate all of those demands but she originally refused.  Posare Salon was also served with a cease and desist letter on February 15, 2018 requiring Monat's demands be met by February 12, 2018 which was impossible as that was three days prior to receiving the letter. Also, Monat demanded that the salon fire Toni Miller, who rents a booth from them but who is not even an employee of the salon. (Ex. 6, Cease and desist Letter to Posare Salon).  Toni Miller was then sued on February 21, 2018. (Ex. 7, Complaint Monat Global v. Toni Miller).

In August 2017 Amy Cheeks, a professional hair stylist who had been previously critical of the Monat products and marketing representations, posted a statement online that said she

> "recently published false statements concerning MONAT and its products. The statements contained claims about MONAT and its products that were flat-out lies.  When I published these lies, I knew they were untrue, or I didn't care whether they were untrue, but I published them anyway.  I simply wanted to damage MONAT's reputation and the reputation of its products…."

(Ex. 1, Nittinger Affidavit). Shortly thereafter, Ms. Cheeks became silent regarding this product. (Id.) It was later discovered that several stylists received cease-and-desist letters and in order to keep the company from suing them had to agree to post an identical statement online and never speak about the product again. (Id.)

On February 21, 2018, the Facebook group creator, Vickie Harrington, transferred the administrator's authority over to the remaining group administrators and removed herself from the groups entirely as a safety precaution after being sued. (Ex. 1, Nittinger Affidavit) Since that time, Ms. Harrington attempted to regain control over the group, despite Monat attempting (as part of its efforts in the suit filed against her) to gain control over the group. (Id.) Apparently, Monat was insisting that its own Market Partners were to act as the administrators of the group. This attempted Monat insider takeover was done without notifying the group's members of this leadership reversal. (Id.)  The remaining administrators and moderators all agreed that it was not in the best interest of the 20,000 members to permit a take-over by the manufacturer of the very products that most members believed were and are harming consumers.  (Id.)

After Monat's unsuccessful takeover attempt via Vickie Harrington, she and three other former group members or administrators (Kayla Baker, Catherine Kathryn Wheeler, and Amy Grainger Carter, each of whom had been sent cease and desist letters and/or sued by Monat) embarked on a campaign of intimidation and confusion at the behest of Monat. (Id.)  Videos were posted in the Facebook group by Kayla Baker reading a statement attributed to all four of the women. (Id.)   In the statement it was claimed that the group had been stolen from Vickie Harrington and that "no one was safe." (Id.)  Everyone was advised to delete their posts and leave the group because Monat was angry and intended to sue everyone in the group who spoke out, as well as all of the administrators and moderators.  (Id.).

6

Around this same time, there was a private communication between Vickie Harrington and all current and past administrators and moderators in an attempt to work out a resolution. (Id.) Vickie Harrington stated that she had spoken to Defendant Monat's President, Stuart McMillan and its Senior Vice President and Chief Legal Counsel Thomas Hoolihan. (Id.) Reportedly, Mr. Hoolihan was prepared to provide a letter stating that none of the current or past administrators or moderators would face a lawsuit if control over the group was relinquished. (Id.) However, Monat was unwilling to provide this letter of assurance in advance. (Id.) The administrators and moderators decided not to relinquish control and advised the group's members that the MONAT – My Modern Nightmare group would be "Archived," which happened on February 26, 2018. (Id.) At that time, a new group was formed which included new rules intended to try and protect its members from Defendant's frivolous SLAPP suits by limiting the use of certain words and identifiers. (Id.) The new group still permitted the sharing of experiences and observations that are protected by the First Amendment. (Id.) Vickie Nittinger has been served with a subpoena by Monat for all of the electronic evidence related to this Facebook group. (Ex. 8, Subpoena)

### III.      MEMORANDUM, LEGAL STANDARD, AND ARGUMENT

Federal Rule of Civil Procedure 65(b) grants this Court the authority to issue a temporary restraining order when "specific facts in an affidavit ... clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." *Id.* In this Circuit, to be eligible for a temporary restraining order a movant must establish the following four elements: (1) irreparable injury if relief is not granted; (2) a substantial likelihood of success on the merits; (3) the threatened injury outweighs the harm that would befall the non-movant; and (4) the relief requested would serve the public interest. *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005).

Plaintiffs need only show the following in order to be entitled to a preliminary injunction: (1) there is a substantial likelihood that he will ultimately prevail on the merits; (2) they will suffer irreparable injury unless the injunction is issues; (3) the threatened injury outweighs whatever injury the proposed injunction may cause to the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Levi Straus & Co. v. Sunrise International Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

### A.  A PROTECTIVE ORDER IS WARRANTED UNDER THESE FACTS.

Initially, Plaintiffs seek a protective order pursuant to Federal rule of Civil Procedure Rule 23(d), stopping Monat's threatening, misleading, and intimidating communications to potential class members during the pendency of this case.  As a putative class action, Rule 23(d)  empowers this Court to stop and correct Monat's unfortunately effective strategy of minimizing participation in this lawsuit. Rule 23(d) provides courts with independent discretion to manage the prosecution of a class action and counteract threats to the fairness of the litigation process.  See *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99 (1981).  The power to act under Rule 23 is independent of the power to act under the more stringent requirements of Rule 65.  Courts have broad authority in exercising their Rule   23(d) discretion   when   a   defendant   improperly communicates with   potential class members. Two common methods are stopping future communications and issuing corrective notice to mitigate the harm of prior improper communications.

Left unchecked, Monat's misleading and intimidating communications with putative class members could dissuade consumers from participating in the case, thereby "undermin[ing] Rule 23." *Belt v. Emcare, Inc*., 299 F. Supp. 2d 664, 667-68 (E.D. Tex. 2003). Plaintiffs seek regulation of Defendant's communications with potential class members through the imposition of a protective order, in order to "prevent frustration of the policies of Rule 23."  See *Gulf Oil*, 452

U.S. at 102.  The Court has authority to regulate communications that jeopardize the fairness of the litigation even if those communications are made to future and putative class members. *O'Connor v. Uber Technologies, Inc.*, 2014 WL 1760314, at *4 (N.D. Cal. May 2, 2014).

Courts have also regulated pre-certification communications that were not confined to putative class members.  See, e.g., *Jackson v. Motel 6 Multipurpose, Inc*., 130 F.3d 999, 1002, 1007 (11th Cir.1997) (holding that the district court abused its discretion in allowing the plaintiffs to "publish notices of the ongoing litigation in publications nationwide and solicit information about potential class members and their alleged experiences with discrimination at Motel 6 motels," when the "communications would be nationwide in scope and would cause serious and irreparable injury to the defendant, when a decision on class certification was not imminent, and when [one of the proposed classes] was clearly not certifiable"); *Recinos–Recinos v. Express Forestry, In*c., 2006 WL 197030, *11 (E.D. La. Jan. 24, 2006) (entering protective order restraining defendants from contacting families of potential class members in an attempt to warn of adverse consequences if they joined the suit). Furthermore, classes may be defined to include future class members.  See *Rodriguez v. Hayes*, 591 F.3d 1105, 1118 (9th Cir.2010) Constraining the court's authority under Rule 23(d) to regulating only communications between a Defendant and current class or putative class members, to the exclusion of future class members, would undermine the court's ability to insure the fair conduct of the action, and protect the integrity of the class and the administration of justice. Fed.R.Civ.P., Rule 23 Adv. Comm. Notes.

In managing a class action, a court may "limit communications with absent class members where the communications were misleading, coercive, or an improper attempt to undermine Rule 23 by encouraging class members not to join the suit."  *Id.* at 667, citing *Kleiner v. First Nat. Bank of Atlanta,* 751 F.2d 1193, 1206 (11th Cir. 1985); *Burrell v. Crown Cent. Petroleum,* 176 F.R.D.

239, 244-45 (E.D. Tex. 1997); *Hampton Hardware, Inc. v. Cotter & Co., Inc.,* 156 F.R.D. 630, 632-33 (N.D. Tex. 1994)). Before a district court can issue an order limiting a party's contact with a potential class, the Supreme Court requires "a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Veliz v. Cintas Corp*., 2004 WL 2623909, at *3 (N.D. Cal. Nov. 12, 2004).

An order of this kind does not require a showing of actual harm. *Veliz,* 2004 WL 2623909 at *3 (citing *Burrell,* 176 F.R.D. at 241-45). Rather, a "likelihood of abuse, confusion, or an adverse effect on the administration of justice" will suffice. Abusive practices that have been considered sufficient to warrant a protective order include communications that coerce prospective class members into excluding themselves from the litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel. *See Cox Nuclear Medicine,* 214 F.R.D. 696, 697-698 (S.D. Ala. 2003) (summarizing cases on abusive communications in class litigation); *In Re Asbestos Litigation*, 842 F.2d 671, 682, n.23 (3d Cir. 1988) (summarizing protective orders issued in class litigation for "blatant misconduct that sought either to affect class members' decisions to participate in the litigation or to undermine class members' cooperation with or confidence in class counsel").

Plaintiffs supply ample evidence to support the necessary findings and demonstrate that the great need for such a limitation. Here, communications have been threatening, intimidating and misleading and Monat's coercion has been explicit. Monat tried to coerce and to convince class members to publicly state that they were lying when they shared their truthful experiences and observations. Defendant has threatened and actually filed lawsuits claiming hundreds of thousands of dollars in damages for the purpose of causing financial and emotional distress to class

members.  This is precisely the kind of "clear record" that reflects a need for a limitation on Monat's communications with members of the putative class.

The specific protective order sought by Plaintiffs here is this – the Court should order Defendant Monat to cease all communications with prospective class members outside of its ordinary course of business of selling hair products during the pendency of this lawsuit, unless such communications are pre-vetted and approved by this Court.  This will protect both the prospective class, but simultaneously permit Monat to communicate with the prospective class members for legitimate business purposes.

### B.  CORRECTIVE NOTICE IS NECESSARY TO MITIGATE HARM FROM PRIOR MISLEADING AND INTIMIDATING COMMUNICATIONS.

Monat engages in this threatening activity to limit communication among class members, and to depress the level of participation in the case.  And it is working.  This cannot stand.  Monat should not be permitted to benefit from its misconduct.  *See Haffer v. Temple Univ.,* 115 F.R.D. 506, 512 (E.D. Pa. 1987) (defendants not permitted to benefit from their improper acts).  Corrective notice should be disseminated to the putative class to level the playing field.

A court may "require – to protect class members and fairly conduct the action" that notice be given in such manner as the court may direct to "some or all class members" at any step in the action."  Fed. R.Civ.P. 23(d)(1)(B).  Courts often order such notice after defendants initiate improper or misleading with putative class members.  *See, e.g., Veliz,* 2004 WL 2623909, at *8 (corrective notice because CEO sent a letter to employees that may have been threatening); *Belt*, 299 F. Supp. 2d at 670 (corrective notice to employees who were sent a misleading letter deriding the lawsuit); *Haffer,* 115 F.R.D. at 512 (issuing corrective notice to class at defendants' expense because defendant had sent a memo and made remarks making it clear it preferred class members not meet with or speak to class counsel); *see also* Manual for Complex

11

Litigation (Third), Section 30.22, at 230 (1995) (the court may require notice to certain class members to correct misinformation or misrepresentations); *Tedesco v. Mishkin*, 629 F. Supp. 1474, 1484 (S.D.N.Y. 1986) (court ordered defendant to pay for letter from plaintiff's counsel correcting misconceptions caused by "false, misleading and coercive communications" to class members); *Pollar v. Judson Steel Corp.,* No. C. 82-6833, 1984 WL 161273 (N.D. Cal. Feb. 3, 1984) (corrective notice ordered to counteract confusion caused by defendant's conduct).

Monat has directly told class members that this lawsuit has no merit.  As Monat has succeeded in depressing participation and frightening putative class members into silence, the corrective notice the Court issues should advise the prospective class members that they have the right to come forward and communicate with attorneys and others honestly regarding their experience without fear of retaliation or reprisal, or retributive litigation.

## C.    INJUNCTIVE RELIEF IS ALSO NECESSARY.

Plaintiffs also seek injunctive relief, a temporary restraining order ("TRO") pending a subsequent preliminary injunction.  A temporary restraining order is an appropriate remedy in a situation where a party is facing immediate irreparable harm that will likely occur before a hearing for preliminary injunction can be held. See 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2951 (2d ed. 1995). To be entitled to a TRO, a movant must show: (1) a substantial likelihood of ultimate success on the merits; (2) the TRO is necessary to prevent irreparable injury; (3) the threatened injury outweighs the harm the TRO would inflict on the non-movant; and (4) the TRO would serve the public interest. *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995).  A request for preliminary injunction is judged by almost the same standard.  *See Johnson & Johnson Vision Care*, *Inc. v. 1–800 Contacts, Inc.,* 299 F.3d 1242, 1246–47 (11th Cir.2002).

The goal of both the TRO and preliminary injunction is to prevent irreparable harm and to "preserve the district court's power to render a meaningful decision after a trial on the merits." *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974). "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Suntrust Bank v. Houghton Mifflin Co*., 268 F.3d 1257, 1265 (11th Cir. 2001). "[T]he most compelling reason in favor of [granting a preliminary injunction] is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act." *Id*. at 573; *see also All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc*., 887 F.2d 1535, 1537 (11th Cir.1989) ("Preliminary injunctions are issued when drastic relief is necessary to preserve the status quo."). Here, Plaintiffs satisfy all the prerequisites for both a TRO and a preliminary injunction, as demonstrated below.

### 1. Plaintiffs have a Substantial Likelihood of Success on the Merits

Plaintiffs will likely succeed on the merits because Defendant's communications to class members are replete with material misstatements and omissions, and are designed to prevent class members from cooperating with Plaintiffs' counsel's investigation and to coerce class members to settle their legal claims for substantially less than full value. "Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil*, 452 U.S. at 100. "The prophylactic power accorded to the court presiding over a putative class action under Rule 23(d) is broad; the purpose of Rule 23(d)'s conferral of authority is not only to protect class members in particular but to safeguard generally the administering of justice and the integrity of the class certification process." *O'Connor*, 2014 WL 1760314, at *3. "Courts may limit

13

communications that improperly encourage potential class members to not join a suit, especially if they fail to provide adequate information about the pending class action." *Id*. at *6-7.

Courts in this Circuit have imposed limitations on communications based on findings that the communications were misleading, coercive, or omitted critical information.  In *Kleiner*, the 11th Circuit recognized that *ex parte* telephone calls with potential class members can be particularly questionable because of their coercive nature and "one-sided presentation" produce "distorted statements" from "susceptible individuals." *Kleiner*, 751 F.2d at 1206.  Courts have limited communications that encourage potential class members not to join the suit.  *See, e.g., Kleiner*, 751 F.2d at 1203; *Hampton Hardware, Inc*., 156 F.R.D. at 632–33 (letters to potential class members warning of potential costs of litigation and advising not to participate in the suit were an improper "attempt to prevent member participation in the class action").  Other courts have restricted communications or invalidated releases when the communications suffered from similar deficiencies.  *See, e.g. Freidman v. Intervet Inc.*, 730 F. Supp. 2d 758, 764 (N.D. Ohio 2010) (releases obtained without informing class members they were giving up the right to participate in putative class action); *In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237, 251 (S.D.N.Y. 2005) (class members not informed of pending class action); *Harris v. Acme Universal, Inc.*, 2014 WL 3907107, at *2 (D. Guam Aug. 11, 2014) (injunction for causing complaints to be withdrawn, making threats, and coercing false statements); *In re Lutheran Bhd. Variable Ins. Products Co.*, 2002 WL 1205695, at *3 (D. Minn. May 31, 2002) (ordering an attorney who had sent misleading solicitations to class members to submit any future solicitations to the Court and the parties for review prior to mailing).

Here, curative action is necessary—and Plaintiffs are likely to succeed on the merits— because Defendant's communications sent to class members are replete with material

misstatements and omissions and were undoubtedly aimed at limiting their liability. Defendant required class members to sign prewritten declarations that Monat knew were false. Such actions are unethical and illegal. *See* 18 U.S.C. § 1622. Monat threatened potential class members with cease and desist letters, and with threats of defamation lawsuits. Ultimately, Monat made good on those threats by filing multiple lawsuits seeking hundreds of thousands of dollars in damages. Given that Defendant's communications are improper on numerous levels, Plaintiffs are confident that the Court will ultimately rule in their favor.

### 2. Retaliation and the Stresses It Causes are Irreparable Harms.

Next, Plaintiffs must demonstrate irreparable harm. Here, Plaintiffs have been able to collect, in a very short period of time, incontrovertible evidence that Defendant's false and misleading communications have caused, and are likely to cause, significant confusion among class members. Irreparable harm has already occurred, and additional harm may occur in the absence of a restriction on communication. This warrants the imposition of a TRO.

Courts facing similar facts also have concluded that errant communications to putative class members create irreparable harm that warrants a temporary restraining order. "Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable." *Kleiner*, 751 F.2d at 1203; *see also Stransky v. HealthONE of Denver, Inc.*, 929 F. Supp. 2d 1100, 1109 (D. Colo. 2013) ("Courts have ordered a variety of remedial measures for misleading and improper communications, including prohibiting further ex parte communications ....").

Absent immediate Court intervention, Plaintiffs will suffer irreparable harm. "[I]mproper conduct for which monetary remedies cannot provide adequate compensation suffices to establish

irreparable harm." *Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir. 1991)(citation omitted). Also, "emotional and physical harm may in some circumstances justify preliminary injunctive relief." *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 511 (2d Cir. 2005)(citing *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 333 (2d Cir. 1995)). Here, Plaintiffs have shown actual intimidation and ongoing emotional harm. First, Defendant's actions are part of a concerted plan to discourage Plaintiffs and the members of the putative class from complaining about their injuries. This is illegal and corrosive to the justice system. Members of the putative class have been dissuaded from contributing to the investigation of the claims of this lawsuit. Many customers report emotional harm flowing from Monat's acts, including stress and anxiety, fear of being sued, sleepless nights—all of which cannot be undone by a future economic award.

### 3. The Balance of Hardships Weighs in Favor of Plaintiffs.

A TRO is a stopgap measure to prevent further harm and is necessary here. The hardships imposed on putative class members in the absence of relief would be significant. Plaintiffs have demonstrated that class members' due process rights to make an informed decision regarding class participation have been irreparably harmed by Defendant's misleading communications. More broadly, individual class members could endure significant hardship if they were misled into settling and releasing their claims and were ultimately prevented from participating in a class action litigation that they believed, with the benefit of complete information, could benefit them. *Kleiner,* 751 F.2d at 1203 ("Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal.")

On the other hand, the hardships imposed upon Defendant are not significant because the corrective action proposed by Plaintiffs does not substantially implicate Defendant's First

Amendment rights.  Plaintiffs merely seek to restrain unsolicited communications with any potential class members regarding this action and/or litigation Monat might pursue individually against such class members unless pre-approved by this Court.  In this regard, the relief Plaintiffs seek is narrowly tailored to avoid further irreparable harm while also avoiding any unnecessary constraints on Defendant and its counsel.  The order Plaintiffs seek does not limit Defendant's ability to communicate with putative class members regarding any topic other than the present litigation and its underlying claims, or threats of litigation by Monat regarding similar allegations.

An order limiting communications between defendant and the potential class members "will satisfy first amendment concerns if it is grounded in good cause and issued with a 'heightened sensitivity' for first amendment concerns." *Kleiner*, 751 F.2d at 1205.  Before issuing the restriction, the Court must consider (1) the severity and the likelihood of the perceived harm; (2) the precision with which the proposed order is drawn; (3) the availability of a less onerous order; and (4) the duration of the proposed order.  *Id*. at 1206.

First, the actual harm from Monat's communications with the potential class members, and the likelihood of continued harm if communication continues unrestricted, is clear.  Unsupervised communications with the potential class members hinder the goal of informed consent and the damage could be irreparable. *See Kleiner*, 751 F.2d. at 1203.  Second, Plaintiffs' proposed restrictions are narrowly tailored so as to only limit speech about the issues related to this litigation.  Third, the "fit" between Plaintiffs' proposed restrictions and their purpose, which is to protect the rights of potential class members, is "reasonable."  *See Board of Trustees v. Fox*, 492 U.S. 469, 480 (1989).  Finally, the proposed restrictions are not of excessive duration, as they only extend until this case is resolved.  *See Kleiner*, 751 F.2d at 1207.

### 4.   The Relief Requested Would Serve the Public Interest

The fourth and final factor courts consider before issuing a TRO is whether the public interest will be served by the relief requested.  Here, that is indisputably the case.  Defendant has no legitimate interest in inducing class members into making uninformed decisions regarding their class and collective action rights, has no legitimate interest in intimidating or coercing potential class members, and has no legitimate interest in keeping potential class members from cooperating in Plaintiffs' counsel's investigation.  A limitation on Defendant's communications is, therefore, in the public interest because the limited prior restraint serves the court's duty "not only to protect class members in particular but to safeguard generally the administering of justice and the integrity of the class certification process."  *O'Connor*, 2014 WL 1760314, at *3.

The public interest implicated here is embodied in Florida's anti-SLAPP statute, Fla. Code § 768.295, a statute that codifies Florida's public policy of protecting free speech regarding matters of public concern.  Florida's statute, like most states' anti-SLAPP statutes, seeks to protect the public against parties filing meritless lawsuits designed to silence or harass critics by forcing them to spend money to defend against these baseless suits.  Defendant's threats (and filing) of defamation suits are precisely the type of meritless lawsuits that the anti-SLAPP statute seeks to protect against.  Because Defendant's conduct is designed to, and is resulting in, the same type of free speech suppression that the anti-SLAPP statute protects against, the public interest is served by immediately stopping Monat from engaging in this conduct.

### 5.  The Court Should Waive the Bond Requirement.

In addition to these factors, a temporary restraining order may only issue "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The amount of the security, however, "is a matter for the discretion of the trial court" and as such, this

Court "may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978). Because the underlying case involves the widespread use of a hair care product that may (if Plaintiffs' allegations are found to be true) harm the general public, and where hundreds if not thousands of individuals have already been physically harmed by this product, and the harm to Defendant is minimal at best, the court should exercise its discretion to require that no security be posted by Plaintiffs, or only a nominal amount for security.

### 6. This Court Should Enter an Order to Show Cause Why a Preliminary Injunction Should Not Issue

Considering the scope and nature of Defendant's massive scheme to suppress any negative discussion of its products and this class action lawsuit, this Court should issue an order to show cause why a preliminary injunction should not issue.  Moreover, due to the limited time period in which a temporary restraining order may remain in force, a show cause order would expedite the determination of whether a preliminary injunction is warranted.  *See, e.g., Fernandez-Roque v. Smith,* 671 F.2d 426, 429 (11th Cir. 1982) (noting that a "characteristic of a temporary restraining order is the limitation on its duration" and that a temporary restraining order extending beyond the twenty-day maximum period in duration may be treated as a preliminary injunction).

### 7. Plaintiffs Should Be Allowed to Engage in Expedited Discovery

Accelerated discovery will benefit the parties and assist the Court in ensuring that a full picture of the facts is before the Court before determining whether to grant Plaintiffs preliminary injunctive relief. Courts frequently evaluate extensive evidence presented by the movant to determine whether a preliminary injunction should issue following the entry of a temporary restraining order.  *See, e.g., California v. Am. Stores Co*., 495 U.S. 271, 277 (1990); *S.E.C. v. Mutual Benefits Corp*., 408 F.3d 737, 741 (11th Cir. 2005).

Specifically, Plaintiffs request that the Court allow Plaintiffs to immediately conduct depositions and immediately propound requests for production of documents and interrogatories. Furthermore, Plaintiffs request that the Court require Defendant's responses to be served within five (5) calendar days.  Such an accelerated discovery schedule will not prejudice Defendant and will serve the interests of justice.  The absence of preliminary discovery will severely prejudice Plaintiffs by denying them the additional documents and information necessary to fully develop the record prior to the preliminary injunction hearing.  Accordingly, this Court should enter an order of expedited discovery.  *See, e.g., Qantum Comm. Corp. v. Star Broadcasting, Inc.*, 473 F. Supp. 2d 1249, 1272 (S.D. Fla. 2007) (court granted expedited discovery to present evidence at the preliminary injunction hearing); *Kirkpatrick v. White*, 351 F. Supp. 2d 1261, 1265 (N.D. Ala. 2005) (court granted expedited discovery together with the temporary restraining order).

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request:  a temporary restraining order against Defendant and their counsel preventing them from engaging in any unsolicited communications with any potential class members regarding this action or threatening litigation based on allegations similar to those herein unless pre-approved by the Court; that the Court immediately schedule a hearing on Plaintiffs' request for a preliminary injunction; that the Court issue a show cause order as to why a preliminary injunction should not issue; that the Court issue an order allowing Plaintiffs to engage in expedited discovery, and; that the requirement for posting a bond pursuant to Rule 65(c) shall be waived.  In the alternative, Plaintiffs request that the Court enter a protective order pursuant to Rule 23(d), prohibiting Defendant Monat from communicating with potential class members during the pendency of this lawsuit, unless such communications are pre-vetted and approved by this Court.

### Rule 65(b)(1)(B) Certification

Pursuant to Rule 65(b)(1)(B) I hereby certify that the undersigned has sent the above

motion for service by process to Defendant's Registered Agent because no attorney has filed an

appearance in this action.

Respectfully submitted this 7th day of March, 2018.

**VARNELL & WARWICK, P.A.**

/s/ Janet R. Varnell
JANET R. VARNELL, FBN:  0071072
BRIAN W. WARWICK, FBN:  0605573
P.O. Box 1870
Lady Lake, FL  32158
Telephone: (352) 753-8600
Facsimile:  (352) 504-3301
*bwarwick@varnellandwarwick.com*
*jvarnell@varnellandwarwick.com*
*kstroly@varnellandwarwick.com*

Charles J. LaDuca (To Apply Pro Hac Vice)
charlesl@cuneolaw.com
William H. Anderson (To Apply Pro Hac Vice)
wanderson@cuneolaw.com
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016
Telephone:  (202) 789-3960
Facsimile:  (202) 789-1813

**JOHN A. YANCHUNIS,** FBN: 0324681
jyanchunis@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 North Franklin Street, 7th Floor
Tampa, Florida  33602
(813) 223-5505 Telephone
(813) 223-5402 Facsimile

**JOEL R. RHINE (***Pro Hac Vice***)**
jrr@rhinelawfirm.com
**DARA DAMERY** (*Pro Hac Vice*)
dld@rhinelawfirm.com

21

**RHINE LAW FIRM, P.C.**
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Tel: (910) 772-9960
Fax: (910) 772-9062

*Attorneys for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

I further certify that a true and correct copy of the foregoing has been dispatched to a process server for service of same upon Defendant's Registered agent.

Dated:  March 7, 2018                    **VARNELL & WARWICK, P.A.**

/s/ Janet R. Varnell
JANET R. VARNELL, FBN:  0071072
BRIAN W. WARWICK, FBN:  0605573
P.O. Box 1870
Lady Lake, FL  32158
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
*bwarwick@varnellandwarwick.com*
*jvarnell@varnellandwarwick.com*
*kstroly@varnellandwarwick.com*