**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Trisha Whitmire and Emily Yanes de
Flores, individually, and on behalf of all
others similarly situated,

                Plaintiffs,

    v.

MONAT GLOBAL CORP.

                Defendant.

Civil Action No. 1:18-CV-20636-DPG

**DEFENDANT MONAT GLOBAL CORP'S RESPONSE TO**
**PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER, A TEMPORARY**
**RESTRAINING ORDER, AND A PRELIMINARY INJUNCTION**

## INTRODUCTION

Monat Global Corp. ("Monat") is a world-class designer, manufacturer, and distributor of hair care and cosmetic products, focusing on shampoos, conditioners, and rejuvenating oils. The efficacy, quality, and safety of Monat's products have been a top priority. Although Monat's formulations are revolutionary and unique, the ingredients it uses have a proven history of safe use in the cosmetics industry, as recognized by world-wide industry and national standards. Despite having no obligation to do so, Monat has engaged several independent laboratories to conduct extensive clinical tests on its products. Those tests unanimously conclude that Monat's products do not irritate the skin, do not weaken the strength of the hair, and do not damage the surface of the hair strand. Rather, Monat's products make hair smoother and more manageable. As part of its rigorous effort to ensure continued product safety, Monat has assembled a world-class team of scientists, doctors, and chemists on its Global Scientific Advisory Board, which includes a world-renowned dermatologist and university professor with over 700 scientific publications.

The quality of Monat's products is demonstrated by Monat's exponential growth since inception. Beginning with only $17 million in sales during its first full year in 2015, Monat achieved over $250 million in annual sales in the United States and Canada in 2017. **Declaration of S. MacMillan** ("MacMillan Dec."), attached as Exhibit B, ¶¶ 8, 10. Since its inception in October 2014, Monat has sold over 14 million units in the United States; it currently has over 300,000 VIP Customers, and over 100,000 independent sales representatives (referred to as "Market Partners"). *Id.* ¶¶ 11–14.

Only after Monat had sold millions of units of product did stylists and salon owners who sold competing salon-brand products begin spreading malicious falsehoods to damage Monat's

sales—primarily through Facebook. These hair stylists claimed that Monat caused everything from hair loss, balding, and scalp lesions, to miscarriages, bloody stool, migraines, and hormonal imbalances. They offered no scientific support for their claims whatsoever. Indeed, such claims are directly refuted by Monat's rigorous clinical studies of its products. Nevertheless, due to the fast-paced nature of social media, the false claims about Monat's products quickly spread across the internet and Facebook like wildfire. And because Facebook is the primary avenue through which Market Partners sell Monat's products, the firestorm has been particularly damaging to Monat's business.

To protect Monat and the many individual, independent market partners whose small businesses depend on it, Monat sent letters to the leaders of the Facebook smear campaign, demanding they cease disseminating their malicious lies. When certain individuals refused, Monat took swift legal action, against those who had engaged in the most malicious, egregious, and anticompetitive conduct. Monat acted to protect its legal rights; not to influence this class action. Indeed, Monat responded to this warrantless Facebook campaign *before* this class action was filed.

While Monat's actions had nothing to do with this class action, Plaintiffs assert that Monat's service of letters to protect its business from the impact of the malicious lies is somehow a violation of Fed. R. Civ. P. 23. Not a single case cited by Plaintiffs supports that contention. Instead, Plaintiffs rely on inapposite cases dealing with communications by counsel *about pending class actions*, and generally after class certification. The proposed class has not been certified, and is unlikely ever to be certified given that Plaintiffs' claims will require individual and medical-based proof. Moreover, Plaintiffs have not pointed to a single statement by Monat concerning this class action, misleading or otherwise, directly to any individual. Instead,

Plaintiffs' claims that Monat has made false and misleading statements are based on unsupported assumptions that Monat's products are causing harm, which are entirely contrary to Monat's reliable, scientific evidence. Plaintiffs have not met their burden to justify the extraordinary relief of enjoining a putative class defendant's right to engage in legitimate litigation against individuals actively violating its rights. The class action mechanism is not a shield against illegal, anticompetitive conduct, and this Court should deny Plaintiffs' request to make it one.

## BACKGROUND

Founded in October 2014 by father-and-son Luis and Rayner Urdaneta, Monat is a "direct-sales" company that engages independent sales representatives to market and sell its products. Drawing on a long tradition of companies like Mary Kay and Avon, the Urdanetas founded Monat not only to provide the public with excellent hair care products, but also to empower individuals across the country to shape their own destinies, and to build their own businesses. The reason for Monat's success is simple: Monat makes  unique, highly sought-after products created by a team of scientists and designers with extensive experience in the hair care and beauty products industry.

### A.     Monat is an Innovative, Safety-Conscious, and Consumer-Focused Hair Care Company

From the beginning, Monat has focused on product safety. The Urdanetas hired a product-formulation team with over 65 collective years of experience in the cosmetic products industry. **Declaration of J. Ross** ("Ross Dec."), attached as Exhibit A, ¶¶ 2,  12, 13. That team is led by Jamie Ross, a chemist, product formulator, and patent holder, who has served as the Chairman of Florida Chapter of the Society of Cosmetic Chemists. *Id.* ¶ 4. It also includes Lucienne De Campos with 24 years of experience in product research and development and

regulatory affairs, as well as Luis Misso, a cosmetic scientist and formulator for over 10 years *Id.* ¶¶ 11–13.

Monat has continuously added well-credentialed scientists, including a Scientific Advisory Board to oversee consumer safety and product development including:

- Dr. Antonelli Tosti, a world renowned dermatologist and expert in hair disorders. *Id.* ¶ 14. Dr. Tosti is a Professor of Dermatology at the University of Miami, has authored over 600 scientific publications, and is the editor of three textbooks on the diagnosis and treatment of hair disorders (*Id.*);

- Dr. Amy Ross, a dermatologist specializing in Mohs Micrographic Surgery and laser treatment of skin and hair disorders (*Id.*);

- Dr. Kevin Smith, an ophthalmologist and Fellow of the Royal College of Surgeons (Canada) in Ophthalmology (*Id.*);

- Dr. Brent Agin, a physician and recognized expert in anti-aging treatments (*Id.*); and

- Monat's original product formulator, Jamie Ross (*Id.*).

Although Monat's formulations are unique, the ingredients have been tried, tested, and used in the cosmetics industry for years, and have been found to be safe for consumer use, in the concentrations Monat uses them, by the Cosmetic Ingredient Review (CIR). *Id.* ¶ 16. The United States Food and Drug Administration (FDA), as well as the cosmetic and beauty industry world-wide, rely on the safety findings of the CIR, and leading companies use ingredients, in concentrations, determined by CIR to be safe. *Id.* ¶ 17. Other ingredients used by Monat are all known to experts in the industry to be safe for use in cosmetics. *Id.* ¶ 18. In fact, in 2017, a licensed Safety Assessor in the European Union, Dr. John Hopkins, PhD., conducted an extensive review of 19 of Monat's top selling products in preparation for Monat's entry into the United Kingdom, concluding that Monat's product formulations utilize "known ingredients with a history of safe use in cosmetic products." *Id.* ¶ 25. Dr. Hopkins also found that "[i]n reviewing

the safety and toxicity profile of the ingredients and their safe use, raw material standards and labeling, it is concluded that there are no likely safety hazards from normal use of this product and when used as directed or from foreseeable conditions of misuse." *Id.* ¶ 26.

Additionally, even though nothing in FDA regulations required it to do so, Monat went above-and-beyond its obligations to ensure the safety and efficacy of its products by engaging a number of reputable, independent, third-party laboratories to conduct clinical tests. *Id.* ¶ 27. Each of those tests has concluded that Monat's products do what they are supposed to do, and do it safely. For example, Kosmoscience, one of the world's leading cosmetics testing laboratories, utilized scanning electron microscopy[1] to study changes to the surface of individual hair fibers, and tested the tensile properties[2] of hair after being treated with Monat products. *Id.*, Ex. 1, at 2; Ex. 2, at 2. These clinical tests, along with a multitude of others, attached as exhibits to the Declaration of Jamie Ross, have resoundingly concluded that repeated application of Monat products does not cause surface damage to the hair, does not weaken the tensile strength of the hair, and does not irritate the skin. *Id.* ¶ 32, 34; Ex. 1, at 4; Ex. 2, at 4; Exs. 4–22. Rather, Monat's products make the hair smoother and easier to comb. *Id.*, Ex. 3, at 3.

Monat's clinical tests show that, contrary to Plaintiffs' allegations in the instant class action, and the multiple false claims by those who sell competing products, Monat's products do not cause the kinds of "adverse reactions" that have been alleged.

---

[1] Scanning electron microscopy is a technique that utilizes electron beams to create high resolution, high depth of field images. The test then utilizes image analysis software programs to standardize the images and to quantify surface damage, enabling a precise comparison of the effects of hair care treatments. *Id.*, Ex. 1, at 8.

[2] Tensile properties indicate how certain materials will react to forces being applied in tension. A tensile test is a mechanical test where a specimen is loaded and stressed in a controlled manner, while measuring the applied load and elongation of the specimen over some distance. *Id.*, Ex. 2, at 8.

**B.      This Lawsuit is the Direct Result of an Anti-Monat, Social Media Hate Group Organized by Stylists Selling Competing Products.**

The basis for the extreme vitriol found in Plaintiffs' Complaint is a social media-fueled fervor that began in late 2017. It began when hair stylists, whose livelihoods depend, in part, on selling salon-brand hair care products in competition with Monat, instigated an anti-Monat Facebook group, "Monat - My Modern Nightmare" (the "Group").[3] The Group quickly grew into a hate group that facilitated and encouraged individuals, many of whom have never even used Monat's products, to spread false and inflammatory stories about Monat. Those negative comments quickly spiraled out of control as Group members began to post and re-post as fact things that they had heard second- or third-hand, or simply fabricated.

Vicki Nittinger, the sole affiant supporting Plaintiffs' motion for a protective order, is a perfect example of the vindictive mentality that proliferates the Group. Nittinger is a hair stylist from Jacksonville, Florida. [Motion, Ex. 1, ¶¶ 1–2]. Nittinger blames Monat and the Market Partners for the failure of one of her businesses, presumably a salon that could not compete with Monat's product sales. MacMillan Dec., Ex. 2. Nittinger regularly spews vitriol about Monat on Facebook, stating, "I hate them more than you know," "[e]very fire [I] can get lit under them the better," and "SUCK A D**K MONAT." *Id.*, Exs. 3, 4 (expletive deleted, all capitals in original).

Yet, troublingly, Nittinger admits that she has never used Monat products, nor has she serviced a client who has used Monat products. *Id.*, Ex. 5. Nonetheless, Nittinger falsely, maliciously, and repeatedly contends that Monat's products can cause widespread damage. *Id.* Exs. 6–8. Nittinger also leads efforts to facilitate media bashing of Monat products, and

---

[3] Since the initiation of this litigation, the original Group has splintered into new Facebook groups, including "Victims of Hair Transformations Detox," "Professional Stylists AGAINST Monat," and others. The name of the second group in particular makes clear that disgruntled stylists, and not end users, are the driving force behind that group. For purposes of this motion, all such anti-Monat Facebook groups are referred to collectively as, the "Group."

encourages individuals to file complaints against Monat with the FDA and the Better Business Bureau. *Id.*, Ex. 9. Nittinger is part of a campaign of defamation and unfair competition being waged against Monat, calculated to destroy its business.

Nittinger's statements are typical of the scare tactics other Group members employ. Kayla Baker, a stylist Monat sued for defamation, repeatedly claimed that after using Monat products, women have "become infertile, lost babies, started menopause early and at the least destructive-had their cycles changed and increased." *Id.*, Ex. 10. Toni Miller, another stylist Monat sued for defamation, has repeatedly claimed that Monat products cause miscarriages, bloody stool, migraines, balding, chemical burns, scalp lesions, and many other issues. *Id.*, Ex. 11. But neither Baker nor Miller have provided any support for these statements, nor have they alleged that they experienced these issues as a result of using the products. Rather, it has become evident that stylists like Miller and Baker are fabricating outrageous claims in order to protect and promote their own salon-brand product sales. *Id.* (Miller advertisement to "treat" the damage caused by Monat, offering a $45 service).

The Group's reach has infected not only social media, but has also encouraged and facilitated anti-Monat news coverage and the filing of multiple class action lawsuits, including this one. The connection between the Group and this litigation is undeniable. The leader and current administrator of the Group, Nittinger, is the sole affiant for Plaintiffs' Motion. [ECF No. 10, Ex. 1]. Moreover, Nittinger actively sought evidence and testimony from Group members in order to support this Motion. MacMillan Dec., Ex. 12. She has also served as Plaintiffs' counsel's *de facto* agent within the Group, obtaining access and evidence for counsel, and making announcements on counsel's behalf. *Id.*

Monat does not deny that some miniscule percentage of the hundreds of thousands of people who use their products may experience negative reactions based on allergies or other hypersensitivities. Given the reach of Monat's products, it would be impossible to avoid every allergy and hypersensitivity that hundreds of thousands of individuals in a given population might present. And it is well recognized in the cosmetics industry that some small, subset of individuals can might react to otherwise, largely benign, ingredients. Extensive scientific evidence, however, proves that there is nothing in Monat's products that could cause the kinds of widespread and severe consequences alleged by members of the Group. These claims, and those made by Plaintiffs in their Complaint are, therefore, demonstrably false.

Rather, something other than the "truth" is animating the rapid rise in the number of false and malicious statements about Monat (which began only after Monat had sold millions of units of product). *See* Elizabeth Bernstein, *Fine-Tune Your B.S. Detector: You'll Need it*, Wall Street Journal (3/19/18), attached as **Exhibit C**. In her article examining recent studies, Bernstein notes that "false information moves faster and farther these days, thanks to social media," and actually spreads more quickly than the truth. *Id.* Amplifying the spread of false information are websites with algorithms that favor inflammatory stories. *Id.* Even more troubling, in this case especially, is that "when people hear a false claim repeated even just once, they are more likely to let it override their prior knowledge on the subject and believe it." *Id.* And, "repeated statements are thought to be more true than statements heard for the first time." *Id.*

Here, what may have started from a small number of financially motivated individuals, quickly snowballed and grew out of control. Reacting to the unfounded frenzy fueled by the Group, Monat had to take quick action to protect the livelihoods of its hundreds of employees, and to over a hundred thousand independent Market Partners. *See* MacMillan Dec., ¶ 38.

**C.**     **Monat Took Proper, Legal, and Justifiable Action Against Several of These Hate Bloggers Who Posted Patently False Information about Monat.**

Rather than allow baseless accusations to spread unabated and potentially destroy the company, Monat took legal action. That action had nothing to do with this case, nor was it an effort to "silence" putative class members. Monat sent letters to stylists and individuals who were administrators and moderators of the Group, or who were making egregiously false statements about Monat. [ECF No. 10, Ex. 5]. By letter, Monat informed the offending individuals that there was "no scientific or factual basis for" the various defamatory posts made in the Group, that Monat's products had "passed all clinical safety tests to which they had been subjected," and that the ingredients Monat uses have been found to be safe for consumers by well recognized industry organizations and experts. Ross Dec., ¶ 16–19; Macmillan Dec., ¶ 45.  Monat demanded an end to the false and malicious statements being published in the Group, and that the Group be shut down given the unrestrained proliferation of false statements. Macmillan Dec., Ex. 13. The majority of Monat's letters were served on about February 8, 2018, almost two weeks before this lawsuit was filed, while the most recent letter was served on approximately February 15, 2018, five days before this lawsuit was filed. MacMillan Dec., ¶ 48.

It was only when certain, particularly troubling individuals refused to abide by Monat's requests that Monat filed suit against them. Monat has filed a total of four lawsuits since July 2017. First, on July 11, 2017—over eight months before this class action as filed—Monat sued Mags Kavanaugh, a hair stylist and salon owner, for falsely stating that Monat's products caused balding, hair loss, and scalp irritation. *See* Exhibit D, at 10–11. At all relevant times, Kavanaugh was represented by highly qualified counsel of her own choosing. Second, on January 29, 2018—three weeks before plaintiffs filed the present class action—Monat filed suit against Vickie Harrington, a former Market Partner, based on comments that Monat's products "contain

a highly dangerous extract called red clover that is horrible for cancer patients, pregnant, and breast feeding woman [sic]," and that Monat's products cause "hair loss, scalp sores, irritation, burning, etc[.]" *See* Exhibit E, at 3.[4] At all relevant times, Harrington was represented by counsel of her own choosing.

Third, on February 19, 2018, the day before the present class action was file, Monat filed suit against Kayla Baker, a hair stylist, for representing that Monat's products cause miscarriage, infertility, hormonal imbalance, and open scalp sores. *See* Exhibit F, at 4–5. Baker is represented by counsel of her own choosing. Finally, on February 21, 2018, a day after the present class action was filed, but one week before Monat was served, Monat filed suit against a hair stylist named Toni Miller who represented that Monat's products caused miscarriages, harm to unborn babies, bloody stool, migraines, problems with breast feeding, menstruation problems, balding, scallop sores, chemical burns, hair loss, and scalp lesions, among other things. *See* Exhibit G, at 3–5.[5] Shortly thereafter, Miller repeatedly contacted Monat asking what could be done to resolve the lawsuit. Monat provided Miller with a settlement offer, which Miller immediately declined and posted on her Facebook page. Although Miller is representing herself, her social media posts evidence that she was well aware of the pendency of this and the other pending class actions. MacMillan Dec., Ex. 11.

---

[4] Addressing her "Fellow Monat Haters," Harrington also encouraged individuals to complain about Monat's products to the Florida Attorney General, the Federal Trade Commission, the Miami Dad Consumer Protection Office, and the Better Business Bureau, *even if such individuals "haven't had a problem." Id.* at 3–4.

[5] Miller also encouraged individuals file complaints about Monat products to over 40 separate United States and Canadian government and private authorities, as well as various news channels in both jurisdictions. *Id.*, Ex. H.

## ARGUMENT

Plaintiffs' Motion should be denied because they have failed to identify a single unlawful communication to a putative class member occurring after this class action was filed.

**I.      A Putative Class Action is Not a Shield Against Accountability for Unlawful Conduct.**

Plaintiffs fail to cite a single case supporting the extraordinary relief they seek. This is not surprising, given that any such case would contravene the well-established First Amendment right to petition the court system. In 2002, the Supreme Court applied long-standing legal principles and held that the right to petition is "one of the most precious of the liberties safeguarded by the Bill of Rights" and that the "right is implied by the very idea of a government, republican in form." *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 524-25 (2002). It held the Petition Clause protects all legal actions except for those that are *both* objectively baseless *and* subjectively motivated by an unlawful purpose. *Id.* at 526. Thus, even lawsuits that are ultimately unsuccessful are protected so long as they involve genuine grievances, as the text of the First Amendment does not "speak in terms of successful petitioning." *Id*. at 532.

Monat's lawsuits are all well-founded, premised on the defendants' egregious and damaging misrepresentations, and filed to vindicate Monat's legal rights. The Court in *Kavanaugh* held that Monat's complaint was well-pleaded when it denied Kavanaugh's motion to dismiss. *See Monat Glob. Corp v. Kavanaugh*, No. 8:17-CV-1666-T-23MAP, 2018 WL 501616, at *2 (M.D. Fla. Jan. 22, 2018). Given the extensive clinical testing, the hundreds of thousands of satisfied customers who have used Monat's products without complaint, and the facial absurdity of their allegations, Plaintiffs cannot credibly claim that Monat's lawsuits were meritless, much

less objectively baseless or subjectively motivated by an unlawful purpose.[6] Those suits, as well as Monat's demand letters, are protected by the Petition Clause.

## II.   Plaintiffs' Motion for a Protective Order, Temporary Restraining Order, and Preliminary Injunction has no Basis in Fact or Law.

### A.   Plaintiffs' Motion Suffers from Debilitating and Fundamental Misconceptions of Fact.

Plaintiffs misconstrue the timeline. Plaintiffs assume that Monat has engaged in a "concerted plan" to target this putative class action by purportedly harassing potential plaintiffs. ECF No. 10, at 16. But, with the exception of Monat's lawsuit against Toni Miller, all of the communications Plaintiffs point to occurred *before* this lawsuit was filed. Monat's lawsuit against Toni Miller was filed only one day after this lawsuit was filed. What is more, Monat's overarching strategy, formed well before this class action was filed, to stop unlawful defamation had nothing to do with this class action. MacMillan Dec., ¶¶ 49-50, 53. Given the timing and purpose of Monat's actions, Plaintiffs cannot meet their burden of showing that Monat has engaged in misleading communications with putative class members in an effort to undermine this lawsuit. The following is a sampling of Plaintiffs' critical misrepresentations:

| FICTION v. FACT | |
|---|---|
| **Fiction** | **Fact** |
| Monat "routinely sends letters to potential class members" to "obtain releases of legal claims" and "declarations of false statements." Mot., at 1. | All of Monat's letters were sent in good faith, before Plaintiffs' complaint was even filed. NacNukkan Dec, ¶ 48. Monat has never sought any declarations of false statements whatsoever. |

---

[6] For these same reasons, Plaintiffs' half-hearted argument that Monat's lawsuits violate Florida's anti-SLAPP statute likewise fails. *See* Fla. Stat. § 768.295 (protecting individuals only from lawsuits "without merit," and filed "primarily" to impinge individual's free speech before a government entity, and in connection with other works not relevant here).

| | |
|---|---|
| Monat's communications "to class members are replete with material misstatements and omissions, and are designed to prevent class members from cooperating with Plaintiffs' counsel." Mot., at 13. | Monat's communications are supported by rigorous clinical studies, and occurred before Plaintiffs' complaint was filed. Ross Dec. Exs. 1-37. |
| Monat "required class members to sign prewritten declarations that Monat knew were false." Mot., at 15. | Monat has never required a class member, or even a putative class member, to sign any prewritten declarations, much less a declaration that was knowingly false. |
| "[H]undreds if not thousands of individuals have already been physically harmed by" Monat's products. Mot., at 19. | Numerous clinical tests indicate that Monat's products are safe, and experts have verified that Monat uses time-tested ingredients. Ross Dec. ¶¶ 15-19.<br><br>Further, Plaintiffs have introduced no admissible evidence to support their conclusion—not even their own testimony. |
| Vickie Harrington is a potential class member. Mot., at 3. | Vickie Harrington was a Market Partner, purchased products for resale, and is therefore excluded from Plaintiffs' own class definition. MacMillan Dec. Ex. 1. |
| Group members Kayla Baker, Kathryn Wheeler, and Amy Grainger Carter "embarked on a campaign of intimidation and confusion at the behest of Monat." Mot., at 6. | Baker, Wheeler, and Carter have, at all times acted independently, and have never acted at Monat's "behest." |

In addition, Plaintiffs' Motion relies heavily on an affidavit of Vicki Nittinger, which in turn relies on inadmissible hearsay, speculation, and facts lacking in foundation. [ECF No. 10, Ex. 1 ¶¶ 3, 5, 6, 9, 12.] For example, Nittinger asserts that "[a] Tulsa Oklahoma news story featuring victims Leah and Amber Alabaster was squashed by threats from Monat executives, including Mr. Hoolihan who is VP [sic] and Chief Legal Counsel [sic] and Monat's president, Mr. McMillan [sic]." *Id.* ¶ 9. Nittinger must have learned this "information" through a real-life game of "telephone": Mr. Hoolihan and Mr. MacMillan purportedly threatened an Oklahoma reporter—who supposedly told Leah and Amber Alabaster about the threat—who then told Nittinger about Mr. Hoolihan and Mr. MacMillan's original conversation with the reporter.

-13-

Nittinger's testimony is, at best, triple hearsay. It cannot, therefore, form the basis for issuing a protective order, particularly one that so significantly limits Monat's First Amendment Rights.

    **B.**    **Plaintiffs Fail to Prove Their Entitlement to a Protective Order Under Rule 23(d).**

        **1.**    **Plaintiffs Fail to Prove Their Entitlement to an Order Limiting Monat's Communications.**

It is well-established that, "but for a few outlying decisions, courts generally permit the defendant and defendant's counsel to communicate directly with . . . absent putative class members before a class action is certified." Newberg on Class Actions, § 9:7 (5th ed. 2017); Manual for Complex Litigation, Fourth, § 21.12, at 249 (2004). Courts throughout the country have recognized putative class action defendants' rights to communicate with absent, potential class members. *Parks v. Eastwood Ins. Servs., Inc.*, 235 F. Supp. 2d 1082, 1084 (C.D. Cal. 2002) ("In a Rule 23 class action, pre-certification communications from defense to prospective plaintiffs is generally permitted."); *Nugussie v. HMS Host N. Am.*, No. C16-0268RSL, 2017 WL 1250420, at *1 (W.D. Wash. April 5, 2017) (same); *Christensen v. Kiewit-Murdock Inv. Corp.*, 815 F.2d 206, 213 (2d Cir. 1987) (same).

To overcome this general rule, a party must make an evidentiary showing (1) that a communication occurred or is threatened to occur, and (2) the form of communication at issue is "abusive in that it threatens the proper functioning of the litigation." *A.R. ex. rel. Root v. Dudek*, WL 5278668, at *8 (S.D. Fla. Sept. 19, 2013) (internal quotes omitted). Abusive practices are those that are "coercive, false, misleading, or confusing." *Alequin v. Darden Restaurants, Inc.*, 2013 WL 3939373, at *11 (S.D. Fla. July 12, 2013). An order limiting communications must be based on a "clear record and specific findings" that weigh the "need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981). "[T]he mere possibility of abuse does not justify routine adoption of a communications

ban," rather, there must be a "likelihood of serious abuses." *Id.* at 104; *see In re Sch. Asbestos Litig.*, 842 F.2d 671, 680 (3d Cir. 1988) (cautioning that orders regulating communications between parties and putative class members "pose a grave threat to first amendment freedom of speech.")

Plaintiffs have fallen far short of the required evidentiary showing for a Rule 23(d) protective order. All of Monat's communications with eventual, putative class members occurred *before* this case was even filed and none of Monat's communications ever referenced this class action. *See Herrera v. R&L Carriers, Inc.*, No. 2:16-cv-795-FtM-99MRM2017 WL 3584891, at *2 (M.D. Fla. June 2, 2017) ("Put simply, the challenged communication cannot be deemed abusive, false, factually inaccurate, unbalanced, or misleading *vis-à-vis the parties and issues in this litigation* because, objectively speaking, the communication says nothing at all about the litigation itself.") (emphasis in original). Moreover, Plaintiffs' have not identified a single statement that was false, misleading, coercive, or even confusing. Indeed, all of Monat's statements were supported by significant clinical data and testing.

These facts must be balanced against the significant limitation Plaintiffs seek to impose on Monat's First Amendment Petition Clause rights. *See Great Rivers Co-op of Se. Iowa v. Farmland Indus., Inc.*, 59 F.3d 764, 766 (8th Cir. 1995) (recognizing that orders limiting communications must be "justified by actual or threatened misconduct of a serious nature," and reversing district court order limiting communications); *Hoffman v. United Telecomms., Inc.*, 111 F.R.D. 332, 336 (D. Kan. 1986) ("To support limitations against its communicating with individual employees who may be claimants, the moving party should supply the court with

facts, supported by the record, as distinguished from stereotyped or conclusory statements."). That balance weighs heavily against Plaintiffs' requested relief.[7]

### 2. Corrective Notice is Unwarranted.

Plaintiffs' request for a "corrective notice" pursuant to Rule 23(d) also fails as a matter of law. Plaintiffs have not pointed to a single communication *about the class action*, nor to one that can be shown to be false, misleading, or coercive. Thus, there is nothing to "correct." Moreover, courts have held that even where a defendant has engaged in misleading communications, a corrective notice prior to class certification is "premature and potentially confusing." *See Hampton Hardware, Inc. v. Cotter & Co., Inc.*, 156 F.R.D. 630, 634–35 (N.D. Tex. 1994).

### 3. Plaintiffs Offer No Persuasive, Countervailing Authority.

Not a single case cited by plaintiffs enjoins, prohibits, or punishes well-founded legal action by a class-action defendant. Instead, the cases cited by Plaintiffs involve false statements about the class action itself. Here, Monat has not made any statements about the class action. It has sued people who have made unlawful, baseless, defamatory statements about its products. A class action is not a shield against illegal activity by putative class members.

Plaintiffs' principal authority, *Gulf Oil*, proves Monat's point. In *Gulf Oil*, the Supreme Court held that orders barring plaintiff contacts with members of the plaintiff class "should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." 452 U.S. 89, 101 (1981).

---

[7] Plaintiffs cite *Jackson v. Motel 6*, 130 F.3d 999, 1002, 1007 (11th Cir. 1997) for the proposition that courts may regulate pre-certification communications.   [ECF No. 10, at 9].   Ironically, in that case the Eleventh Circuit found that the District Court should not have allowed the plaintiff to solicit information from and about potential class members and their experience relevant to the litigation, exactly what Nittinger and others have done here on behalf of Plaintiffs' counsel, with respect to Group members. **MacMillan Decl.**, Grp. Ex. 12.

-16-

Other cases cited by Plaintiffs came to the same conclusion and denied the protective order being sought. *See Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696 (S.D. Ala. 2003); *In re Sch. Asbestos Litig.*, 842 F.2d at 684.[8]

## C.   Plaintiffs Cannot Meet Their Burden of Proving They are Entitled to Injunctive Relief.

"A TRO or preliminary injunction is appropriate where the movant demonstrates that: (a) there is a substantial likelihood of success on the merits; (b) the TRO or preliminary injunction is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and (d) the TRO or preliminary injunction would not be averse to the public interest." *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034–35 (11th Cir. 2001). Such relief is an "extraordinary remedy," and "plaintiff has the burden of persuasion as to each of these four elements." *Oce N. Am., Inc. v.*

---

[8] The rest of Plaintiffs' cases are wholly inapposite. For example, in *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985) the court focused on the coercive power of defendant's exclusion requests, noted the narrowly-tailored injunction sought by the plaintiff that related only to discussions regarding the class action, and focused on the fact that it was only restraining commercial speech. *Id.* Here, in sharp contrast, Monat's communications are not coercive, the injunction sought by Plaintiffs is incredibly broad in scope, and Plaintiffs seek to restrain Monat's non-commercial speech. Plaintiffs' other authority also fails to show that Plaintiffs are "likely to succeed" in this action. *See Hampton Hardware,* 156 F.R.D. 630  (defendant's communications explicitly told recipients about the class action and told them not to join); *Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758 (N.D. Ohio 2010) (defendant sent settlement agreements that explicitly addressed class action claims); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237 (S.D.N.Y. 2005) (after class action filed, defendant bank tried to reduce class size by inserting arbitration clause in cardholder agreement but did not tell customers about pending lawsuit and how new agreement would prohibit participating in it); *Harris v. Acme Universal*, 2014 WL 3907107 (D. Guam Aug. 11, 2014) (communications at issue occurred after class action filed, were between employer and employee, and sought to disrupt class action); *In re Lutheran Brotherhood Variable Ins. Prods. Co.*, No. 99-MD-1309PAMJGL, 2002 WL 1205695 (D. Minn. May 31, 2002) (*plaintiff's* counsel improperly sought additional class members by deceitfully misrepresenting court rulings in the class action).

*Caputo*, 416 F. Supp. 2d 1321, 1325 (S.D. Fla. 2006). Here, Plaintiffs cannot establish any one of the four mandatory criteria for the relief they seek.[9]

### 1.    Plaintiffs Cannot Show a Likelihood of Success on the Merits.

Likelihood of success on the merits, "is generally considered the most important." *Id.*, citing *Garcia-Mir v. Meese*, 781 F.3d 1450, 1453 (11th Cir. 1986). The bar is high: "If Plaintiff's claims are 'questionable' the likelihood of success criterion will not be satisfied." *Don King Prods., Inc. v. Mosley*, No. 15-61717-CV, 2015 WL 11198251, at *8 (S.D. Fla. Aug. 25, 2015), citing *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 340 (1999). Plaintiffs have failed to introduce any evidence, including their own testimony, that Monat's products cause any of the medical issues they have alleged. Rather, Plaintiffs rely on inadmissible hearsay in the form of a Buzzfeed article (Mot., at 3]), and an affiant who has, by her own admission, never used any Monat products. MacMillan Dec. ¶ 28, Ex. 5 (Nittinger – never used the product, never serviced a client who has used the product). That, plus the vast scientific evidence that the Monat's products are safe, make it clear that Plaintiffs have very little likelihood of success in this case.

### 2.    Plaintiffs Cannot Demonstrate Irreparable Harm.

Even if Plaintiffs' claims had merit, the Motion still fails as Plaintiffs cannot show irreparable injury is likely if the relief is not granted. "Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in

---

[9] Similarly, Plaintiffs' request an order to show cause why a preliminary injunction should not be granted, [ECF No. 10, at 20], fails. In essence, Plaintiffs seek the equivalent of an actual preliminary injunction, and the Court should treat it as such. *See Jupiter Yacht Charters, Inc. v. Stuart Boat Works, LLC*, 2014 WL 12461359, at *2 (S.D. Fla. Apr. 16, 2014) ("The Court construes this request [for an order to show cause] as a Motion for Preliminary Injunction."). Since the requirements for a preliminary injunction are the same as for a temporary restraining order, and since Plaintiffs are not entitled to the latter, they are not entitled to the former. *See id.*

original) (holding that 9th Circuit's standard of only requiring plaintiffs to show a "possibility" of injury to be "too lenient"). "The injury must be 'neither remote nor speculative, but actual and imminent.'" *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Plaintiffs argue they have made the requisite showing of irreparable harm due to purported "intimidation and ongoing emotional harm." [ECF No. 10, at 16.] One case they cite in support found no showing of irreparable harm at all, and denied plaintiff's motion. *See Moore v. Consol. Edison Co. of New York*, 409 F.3d 506 (2d Cir. 2005). The other found irreparable harm, but includes a fact pattern showing how high the movant's bar is. In *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328 (2d Cir. 1995). In *Shapiro*, the court held that if the plaintiff did not receive a parking space in her building, she "was subject to risk of injury, infection, and humiliation" as a result of an illness and disability that led to urinary problems. Defendant argued plaintiff's harm wasn't irreparable because she could use a "indwelling catheter." *Id.* at 330-32. Given the extreme nature of what plaintiff would have to undertake to avoid harm, the court denied defendant's argument. There is no similar potential for irreparable harm in this case.[10]

## III.    If an Injunction is Entered, this Court Should Require that Plaintiffs Post a Bond in Excess of $10 Million.

If, *arguendo*, the Court grants the Motion, it can enter a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and

---

[10] Plaintiffs cannot establish the third element for a temporary restraining order, as the harm to Monat resulting from eliminating its ability to stop unlawful defamation outweighs the nonexistent threat of harm to Plaintiffs if this Motion is denied. *See Med. & Chiropractic Clinic, Inc. v. Oppenheim*, 2016 WL 6093223, at *8 (M.D. Fla. Oct. 19, 2016) ("Plaintiff has not shown irreparable injury, and thus it has not shown that the threatened injury outweighs the harm an injunction may cause Defendants.") As to the fourth element, the clear chilling effect that enjoining Monat from exercising its Constitutional rights shows that the Motion is not in the public interest. *See United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest[.]").

damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The bond should be in an amount of potential harm that Monat can establish with a "rational basis," and pertinent factors include lost profits, lost market share, advertising expenses, and other expenses resulting from the injunction. *See e.g. Sanofi-Synthelabo v. Apotex, Inc*., 470 F.3d 1368, 1384 (Fed. Cir. 2006) (approving $400 million bond); *Estetique Inc. USA v. Xpamed LLC*, 2011 WL 5873029, at *2 (S.D. Fla. Nov. 22, 2011) (setting bond at level defendant established to a rational basis). Here, the damages to Monat that would result from wrongful issuance are significant, threaten the viability of the company and are difficult to quantify given that they are based on lost profits. As a conservative estimate, Monat asks for $10 million, which represents less than 14% of its sales for 2017.

## IV.    Plaintiffs have Not Established a Basis to Conduct Expedited Discovery.

Finally, Plaintiffs' request for expedited discovery (Motion at 7-8) is improper. Plaintiffs ask for leave to "immediately" take depositions and propound written discovery, and conclusorily assert it will "serve the interests of justice." Plaintiffs have to establish "good cause" for expedited discovery. *See e.g. Procaps S.A. v. Patheon, Inc*., 2012 WL 12845604, at *3 (S.D. Fla. Dec. 21, 2012). Plaintiffs make no effort to limit the expedited discovery it in any fashion, or to actually justify its necessity. Plaintiffs' failure to do so means the request should be denied.

### CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Protective Order, a Temporary Restraining Order, and a Preliminary Injunction should be denied in full.

Date: March 21, 2018

By: /s/ William C. Meyers
William C. Meyers, Esq., admitted pro hac vice
David J. Chizewer, Esq., admitted pro hac vice
Joseph Hoolihan, Esq., admitted pro hac vice
GOLDBERG KOHN LTD.

55 East Monroe, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 201-4000
Facsimile: (312) 332-2196
william.meyers@goldbergkohn.com
david.chizewer@goldbergkohn.com
joseph.hoolihan@goldbergkohn.com

*Co-Counsel for Monat Global Corp*

By: /s/ Andrea Cox
Jeffrey B. Shapiro
Florida Bar No. 484113
Andrea Cox
Florida Bar No. 173495
SAUL EWING ARNSTEIN & LEHR LLP
200 S. Biscayne Blvd., Suite 3600
Miami, FL 33131
(305) 428-4500
jeffrey.shapiro@saul.com
andie.cox@saul.com
MIA-ctdocs@arnstein.com

*Co-Counsel for Monat Global Corp*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing and all exhibits were filed with the Court using the CM/ECF filing system, which then sent notification of filing to the following counsel of record on this 21st day of March, 2018 on:

| | |
|---|---|
| Janet R. Varnell, Esq.<br>Brian W. Warwick, Esq.<br>**VARNELL & WARWICK, P.A.**<br>P.O. Box 1870<br>Lady Lake, FL 32158<br>Telephone: (352) 753-8600<br>Facsimile: (352) 504-3301<br>*jvarnell@varnellandwarwick.com*<br>*bwarwick@varnellandwarwick.com*<br><br>John A. Yanchunis, Esq.<br>**MORGAN & MORGAN**<br>201 North Franklin Street, 7th Fl.<br>Tampa FL 33602<br>Telephone: (813) 223-5505<br>Facsimile: (813) 223-5402<br>*jyanchunis@forthepeople.com*<br><br><br>*Attorneys for Plaintiffs and the Proposed Class* | Charles J. LaDuca, Esq.<br>William H. Anderson, Esq.<br>**CUNEO GILBERT & LADUCA, LLP**<br>4725 Wisconsin Avenue, NW<br>Suite 200<br>Washington, DC 20016<br>Telephone: (202) 789-3960<br>Facsimile: (202) 789-1813<br>*charlesl@cuneolaw.com*<br>*wanderson@cuneolaw.com*<br><br>Joel R. Rhine, Esq.<br>Dara Damery, Esq.<br>**RHINE LAW FIRM, P.C.**<br>1612 Military Cutoff Road, Suite 300<br>Wilmington, NC 28403<br>Telephone: (910) 772-9960<br>Facsimile: (910) 772-9062<br>*jrr@rhinelawfirm.com*<br>*dld@rhinelawfirm.com* |

By:   /s/ Andrea Cox
Jeffrey B. Shapiro, FBN 484113
Andrea Cox, FBN 173495
SAUL EWING ARNSTEIN & LEHR LLP
200 S. Biscayne Blvd., Suite 3600
Miami, FL 33131
(305) 428-4500
*jeff.shapiro@saul.com*
*andie.cox@saul.com*
*MIA-ctdocs@arnstein.com*

**Attorneys for MONAT GLOBAL CORP.**